## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| ALTICOR INC., a Michigan corporation, and AMWAY CORP., a Virginia corporation,<br><br>    Plaintiffs,<br><br>v<br><br>DAN WANG, a natural person, HAPPY VALLEY ZBB INC, a California corporation, and GUIHUA ZHAO, a natural person,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 USC § 1114; 15 USC § 1125(a); 15 USC § 1125(c); TORTIOUS INTERFERENCE, AND RELATED CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Alticor Inc. and Amway Corp. (collectively, "Plaintiffs") bring this action against Defendants Happy Valley ZBB Inc, Guihua Zhao, and Dan Wang (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); common law trademark infringement and unfair competition; unfair competition in violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*; and tortious interference with existing contracts. These claims arise from Defendants' misappropriation of Plaintiffs' trademarks in connection with Defendants' unlawful and unauthorized sale on the Internet of materially different and non-genuine products bearing Plaintiffs' trademarks to unwitting customers. In support of their Complaint, Plaintiffs allege as follows:

### PARTIES

1.    Alticor Inc. ("Alticor") is a corporation, organized under the laws of the State of Michigan, with its principal place of business located in Ada, Michigan. Alticor is the parent

company of Amway Corp. and the owner of the Amway family of trademarks and all associated intellectual property rights.

2.      Amway Corp. ("Amway") is a corporation, organized under the laws of the State of Virginia, with its principal place of business located in Ada, Michigan.

3.      Dan Wang ("Wang") is a natural person who, upon information and belief, resides at 202 N. Lone Hill Avenue, Glendora, CA 91741.  Wang operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "everything essentials health" (the "Amazon Storefront").   The Amazon Storefront can be accessed at https://www.amazon.com/sp?seller=A1VU7L4IZF86K8.   Wang does business throughout the United States through the Amazon Storefront, including in Michigan.

4.      Happy Valley ZBB Inc ("Happy Valley") is a corporation organized under the laws of the State of California.  According to the articles of incorporation for Happy Valley that were filed with the Secretary of State of California, the principal place of business of Happy Valley is located at 15920 Pomona Rincon Road, #7102, Chino Hills, CA 91709, which is an apartment unit.  Happy Valley operates or assists in the operation of the Amazon Storefront and does business throughout the United States through the Amazon Storefront, including in Michigan.

5.      Guihua Zhao ("Zhao") is a natural person who, upon information and belief, resides at 15920 Pomona Rincon Road, #7102, Chino Hills, CA 91709.  Zhao operates or assists in the operation of the Amazon Storefront and does business throughout the United States through the Amazon Storefront, including in Michigan.

6.      Upon information and belief, Happy Valley was formed on or around July 7, 2021 when articles of incorporation were filed with the California Secretary of State.  The articles list Zhao as the incorporator of Happy Valley and as the agent for service of process for Happy Valley,

do not list any other individuals as officers of Happy Valley, and list the same address—15920 Pomona Rincon Road, #7102, Chino Hills, CA 91709 (the "Pomona Rincon Apartment")—as both the business address of Happy Valley and the personal address of Zhao.

7.     Accordingly, upon information and belief, Zhao is in control of, a principal of, and primarily responsible for Happy Valley and its actions.

8.     Plaintiffs assert claims against Zhao in his individual capacity and also in his capacity as a corporate officer of Happy Valley.  Upon information and belief, both Zhao in his individual capacity and Happy Valley assist in and are responsible for the operation of the Amazon Storefront.

9.     Alternatively, as the sole corporate officer of Happy Valley, Zhao directs, controls, ratifies, participates in, or is the moving force behind the acquisition and sales of infringing products bearing Plaintiffs' trademarks by Happy Valley.  Upon information and belief, Zhao personally participates in the acquisition and sale of infringing products by Happy Valley. Accordingly, Zhao is personally liable for infringing activities carried out by Happy Valley without regard to piercing the corporate veil.

10.     Alternatively, on information and belief, Happy Valley follows so few corporate formalities and is so dominated by Zhao that it is merely an alter ego of Zhao.  Accordingly, Plaintiffs are entitled to pierce the corporate veil of Happy Valley and hold Zhao personally liable for the infringing activities of Happy Valley.

## **JURISDICTION**

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and their claims arising under the laws of the State

of Michigan are substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Michigan and established sufficient minimum contacts with Michigan by, among other things, advertising and selling substantial quantities of infringing products bearing Plaintiffs' trademarks to consumers within Michigan through a highly interactive commercial website, with knowledge that Plaintiffs are located in Michigan and are harmed in Michigan as a result of Defendants' sales of infringing products to Michigan residents.  Defendants know that Plaintiffs are located in Michigan, among other reasons, because Plaintiffs have informed Defendants of their location in cease-and-desist letters they sent to Defendants.  Wang also used to be an Amway Independent Business Owner and is well aware of Plaintiffs' location through his past business relationship with Plaintiffs.  Plaintiffs' claims arise out of Defendants' substantial and regular sales of infringing products bearing Plaintiffs' trademarks to Michigan residents.

## VENUE

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district or, in the alternative, because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Plaintiffs and Their Trademarks

14.     Plaintiffs are worldwide leaders in developing, manufacturing, and providing nutrition, beauty, bath and body, cookware, household, and other products to consumers under

various brands, including Amway®, Nutrilite®, and Artistry® (collectively, "Amway products"). Plaintiffs permit Amway products to be sold to U.S. consumers only through Amway.com and through Amway Independent Business Owners ("IBOs"), which enter into contracts with Amway to be able to sell Amway products.

15.    Plaintiffs devote a significant amount of time, energy, and resources toward protecting the value of their brands, products, name, and reputation. By distributing products exclusively through their own website and through IBOs, Plaintiffs ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Amway family of brands. IBOs provide users of Amway products with explanation and guidance about the safe and proper use of Amway products. IBOs are required by their contracts with Amway to exercise strict quality control requirements over the products they sell to consumers. In the highly competitive nutrition and household product market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

16.    To promote and protect the Amway family of brands, Alticor has registered numerous trademarks with the United States Patent and Trademark Office. These trademarks include, but are not limited to: AMWAY® (U.S. Trademark Registration Nos. 716,672, 847,709, 4,031,832, 4,199,852, 4,289,794, and 4,481,517), NUTRILITE® (U.S. Trademark Registration Nos. 402,891, 689,389, 2,145,912, 3,535,340, 4,748,189, and 4,478,190), and ARTISTRY® (U.S. Trademark Registration Nos. 856,184, 1,505,505, 1,519,877, and 4,645,525), (collectively, the "Amway Trademarks").

17.    Alticor has licensed the Amway Trademarks to various subsidiaries, including Amway.

18.     The registration for each of the Amway Trademarks is valid, subsisting, and in full force and effect.

19.     Plaintiffs actively use and market all of the Amway Trademarks in commerce.

20.     Due to the quality and exclusive distribution of Amway products, and because Plaintiffs are recognized as the sources of high quality products, the Amway Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to Plaintiffs' Quality Controls, Reputation, and Goodwill

21.     E-commerce retail sales have exploded over the past decade.  From 2009 to the second quarter of 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.5%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 18, 2022), https://fred.stlouisfed.org/series/ECOMPCTSA.

22.     In 2021 consumers spent $870 billion on e-commerce sales, a 14% increase from 2020.  The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021. *See* Jessica Young, *U.S. ecommerce grows 14.2% in 2021*, Digital Commerce 360 (February 18, 2022), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

23.     Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

24.     Unlike when purchasing products at a brick-and-mortar store or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch,

6

inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the brand owner.

25.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

26.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  See Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market*," CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   See Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

27.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  See Spencer Soper, *Amazon Gets Real About Fakes*, BLOOMBERG, Nov. 28, 2016, https://www.bloomberg.com/ news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/ technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

28.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  See Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

29.     In its 2018, 2019, 2020, and 2021 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit,"

"pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2022), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

30.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no way to exercise their quality controls over products sold by unauthorized sellers or ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, some of a brand owner's products are ingested by consumers.

31.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

32.     When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer or brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

33.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

34.     When a customer purchases on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

35.     Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products:  online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

36.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

37.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.  Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade

Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019,  https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

38.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill.

**Plaintiffs' Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Customers Who Purchased Poor Quality Products from Unauthorized Sellers On Online Marketplaces**

39.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

40.     Numerous consumers have written negative reviews of Amway products being offered for unauthorized sale on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Amway products low "ratings" and complained of receiving products that were expired, tampered with, previously used, damaged, defective, allegedly counterfeit, or of otherwise poor quality:

41.     For example, Defendants have sold on Amazon the Amway product seen in the screenshot below:



42.     As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were expired, tampered with, previously used, damaged, defective, and of worse quality than other Amway products consumers had previously purchased through other channels:













43.   Below is a screenshot of another Amway product that Defendants have sold on

Amazon:



44.     As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were expired, tampered with, previously used, damaged, different from what was advertised, and allegedly counterfeit:





 Zingcin

★☆☆☆☆  **broken**

Reviewed in the United States us on April 20, 2022

**Verified Purchase**

Didn't come in original packaging and most of the tubes were broken and unsealed



---

 Veronica Toledo

★☆☆☆☆  **Bad, don't buy**

Reviewed in the United States us on February 8, 2022

**Verified Purchase**

I received the opened packages, they were sealed but the packages were damaged and they were all made in different countries…



5 people found this helpful

---

 Sophie's mom

★★☆☆☆  **All tubes had expired**

Reviewed in the United States us on May 9, 2022

**Verified Purchase**

I bought these 6 toothpaste tubes in late April 2022…and they all had expired 7/1/2021. And if you are thinking about reselling any of them (even if you get some that haven't expired) forget it. All 6 were jammed into a priority mail soft mailer and most of the boxes were crushed.

Helpful | Report abuse

---

 Min Filban

★★☆☆☆  **Not sure if this is the real stuff….**

Reviewed in the United States us on June 5, 2021

**Verified Purchase**

The label is slightly different from what's described. The one I received says Net 200g and not 6.75 oz. Even in the back is different. And most of all, the flavor is weird.



---

45.     Below is a screenshot of another Amway product that Defendants have sold on Amazon:



46.     As seen in the following sample screenshots of customer reviews, numerous consumers have left negative reviews of this product complaining of receiving products that were previously opened and damaged:





47.     The foregoing reviews are only a small sample of the negative reviews of the products depicted above and of other Amway products listed on the Amazon website that Defendants have sold through their Amazon Storefront.

48.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Amway Trademarks on Amazon and are not subject to Plaintiffs' quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar

negative reviews of Amway products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Amway Trademarks from Defendants.

**Plaintiffs Prohibit Sales on Online Marketplaces, Exercise Strict Quality Controls Over the Production and Distribution of Amway Products, and Provide a Guarantee for Products Purchased from IBOs**

49. To maintain quality controls over Amway products, Plaintiffs allow Amway products to be sold in the United States only by Plaintiffs themselves (through Amway.com) or by IBOs.

50. Because of the threats to their goodwill and consumer safety that are caused by sales on online marketplaces, as discussed above, Plaintiffs do not sell Amway products on any online marketplace and strictly prohibit IBOs from selling Amway products on any online marketplace.

51. IBOs must enter into contracts with Amway to be permitted to sell Amway products. These contracts authorize IBOs to sell Amway products only in certain channels and require IBOs to provide various customer services and exercise various quality controls over Amway products (collectively, the "Amway Rules"). Amway enforces the quality controls established in the Amway Rules and its contracts with IBOs, and its ability to maintain quality controls is essential to the integrity and safety of Amway products, the value of the Amway Trademarks, and the safety and satisfaction of consumers.

52. The Amway Rules expressly prohibit IBOs from selling Amway products on the Internet unless they use an authorized Amway.com platform.

53. The Amway Rules require, among other customer service requirements and protections, that IBOs provide customers with vital information regarding Amway products and their uses. This person-to-person interaction between IBOs and their customers allows for

explanation and guidance on the safe and proper use of Amway products.  To this end, the Amway Rules prohibit IBOs from selling or displaying Amway products in retail establishments.

54.     Under the Amway Rules, IBOs must also provide personal services to customers concurrently with and after their sales.  IBOs have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits.  IBOs are therefore uniquely qualified to explain best practices for safe and optimal use of Amway products, and these services of course cannot be provided by non-IBOs who sell Amway products.

55.     IBOs are also trained and instructed to present only complete and truthful information about Amway's products and services, and must refer only to the statements permitted in authorized literature.  It is essential to consumer well-being and Plaintiffs' reputation that customers are able to make fully informed decisions about whether to purchase Amway products and which products to purchase.  The Amway Rules prohibit IBOs from providing misleading or false information to customers, and Amway monitors its IBOs to ensure that IBOs do not violate these prohibitions.

56.     To ensure that customers receive products of the quality they have come to expect from Plaintiffs, IBOs are prohibited from altering any Amway product, label, or accompanying literature.  IBOs may sell Amway products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Amway products.  IBOs must explain to customers that Amway products are safest when used as directed on the product labels.

57.     IBOs must also follow storage and handling requirements for all Amway products, including storing products in a cool, dry place and ensuring that products are never exposed to freezing temperatures.  Numerous Amway products are permanently damaged if they are allowed to freeze.

58.    Amway tracks all purchases of Amway products from Amway.com and from IBOs, so that it can conduct a recall or disseminate other important consumer safety information in the event that a quality control issue arises.  Amway is not able to track products that are sold outside of authorized channels and, thus, unable to alert customers who purchased from unauthorized sellers if a quality issue arises.

59.    For all of these reasons, Plaintiffs limit third party sales of their products to IBOs who have access to, and must follow, the Amway Rules.  By so limiting their sales, Plaintiffs are able to protect the safety of their consumers and maintain the integrity and reputation of the Amway family of brands.

60.    Amway also prohibits IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell those products on the Internet (including on Amazon).  The purpose of this restriction is to ensure that Amway products are sold to consumers only by Plaintiffs themselves or by IBOs who are subject to and follow Plaintiffs' quality controls.

61.    Amway also provides customers who purchase Amway products through authorized chains of distribution with the Amway Satisfaction Guarantee ("Satisfaction Guarantee"), which allows customers who are not completely satisfied with an Amway product to receive a refund or product replacement within 180 days of purchase.  Customers who purchased Amway products from IBOs are given a full refund, credit, or a product exchange by the IBO from whom they purchased their product.  Customers who purchased products from Amway.com may return their products to Amway, in accordance with return instructions on their product's official packing slip.

62.     Amway offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Plaintiffs' quality controls and have agreed to follow their quality controls—specifically, IBOs and Plaintiffs themselves.  Because non-IBOs are not subject to Plaintiffs' quality controls and Amway cannot therefore ensure the quality of products sold by non-IBOs, the Satisfaction Guarantee is not available for Amway products purchased from any third party who is not an IBO.

**Amway's Discovery of Defendants' Sales of Amway Products on the Internet**

63.     Because the unauthorized sale of Amway products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Amway Trademarks, Amway actively monitors the sale of Amway products online.

64.     Through these efforts, Amway discovered that high volumes of products bearing the Amway Trademarks were being sold on Amazon through a storefront called "Just Grand Store."

65.     When Amway first discovered the "Just Grand Store" storefront, the storefront listed its "Business Name" as Dan Wang and its "Business Address" as 9809 Via Esperanza, Rancho Cucamonga, CA 91737.  Through investigation, Amway confirmed that, according to public records databases, an individual named "Dan Wang" resides at 9809 Via Esperanza, Rancho Cucamonga, CA 91737.  Amway also discovered that an individual named "Dan Wang" had entered into a contract with Amway to become an IBO on or around October 27, 2020.  Through his IBO account, Wang had provided to Amway the same address that appeared on the "Just Grand Store" storefront.

66.     Amway contacted Wang and warned him that he was breaching the Amway Rules by selling Amway products on Amazon.  After Amway issued its warning, the "Just Grand Store"

storefront temporarily stopped listing Amway products but then changed its storefront name to "Happy Valley Shop" and began relisting Amway products for sale.

67.     On September 15, 2021, Amway terminated its IBO agreement with Wang after he continued to list Amway products for sale on the "Happy Valley Shop" storefront that had previously been called "Just Grand Store."  Wang has not been an IBO since September 15, 2021.

68.     In 2022, Amway discovered the Amazon storefront had changed its name again, this time to "everything essentials health," and had resumed listing Amway products for sale.  To confirm that Wang continued to operate the storefront, Amway requested information about the "everything essentials health" storefront from Amazon.  In response, Amazon disclosed that the contact name provided by the operator(s) of the storefront was "Dan Wang" and the contact email address that was provided was dandanwin888@outlook.com.

69.     On May 17, 2022, counsel for Plaintiffs sent a cease-and-desist letter to Wang to the email address Amazon had provided and by overnight mail to the physical address—9809 Via Esperanza, Rancho Cucamonga, CA 91737—that appeared on the Amazon Storefront.  Plaintiffs' letter explained that Wang and all others who are assisting with his sales are infringing the Amway Trademarks through their online sales and causing harm to Plaintiffs.  Plaintiffs' letter demanded that Defendants permanently cease selling products bearing the Amway Trademarks and disclose every person and entity that provided Defendants with the products they had listed for sale on their Amazon Storefront.

70.     On May 18, 2022, only a day after its letter was sent, Plaintiffs received an email response to their email that had enclosed their cease-and-desist letter.  The email stated that the recipient was "Bo Zheng," and "not Mr. Wang," but it acknowledged that Amway products were

being sold through the "everything essentials health" storefront and asserted that the operators of the storefront wished to "cooperate" with Plaintiffs and stop selling Amway products.

71.     In the following days, the "everything essentials health" storefront temporarily stopped listing products bearing the Amway Trademarks for sale.  However, after several weeks the storefront resumed listing Amway products and the public-facing contact information that appears on the storefront also changed.  Specifically, the "Business Name" of the storefront changed to "HAPPY VALLEY ZBB INC" and the "Business Address" of the storefront changed to "15920 POMONA VALLEY ZBB INC APT 7102 CHINO HILLS CA 91709 US":

**Detailed Seller Information**

**Business Name:** HAPPY VALLEY ZBB INC
**Business Address:**
   15920 POMONA RINCON RD
   APT7102
   CHINO HILLS
   CA
   91709
   US

72.     Through investigation, Amway discovered that, on or around July 7, 2021, a corporation called "Happy Valley ZBB Inc" was organized under California law.  Amway also discovered that the articles of incorporation that were filed for Happy Valley lists "Guihua Zhao" as the incorporator and agent for service of process of Happy Valley, do not list any other individuals as officers of Happy Valley, and list the same address that was added as the "Business Address" of the "everything essentials health" storefront—15920 Pomona Rincon Road, #7102, Chino Hills, CA 91709—as both the business address of Happy Valley and the personal address of Zhao.

73.     Through further investigation Amway has been unable to confirm that "Bo Zheng" is a real person.  Upon information and belief, including because the "everything essentials health"

listed its "Business Name" as "Dan Wang" before receiving Plaintiffs' cease-and-desist letter, the "everything essentials health" storefront uses the email address dandanwin88@outlook.com to conduct business, and because Wang used to be an Amway IBO, Plaintiffs believe that the May 18, 2022 email they received was most likely not sent by "Bo Zheng" and was instead sent by Wang or Zhao.

74.     Based on these facts and its investigation, Amway believes that Dan Wang, Happy Valley, and Zhao are all collectively operating the "everything essentials health" Amazon storefront and are jointly responsible for sales of infringing products through the storefront. Discovery may reveal that additional individuals and/or entities are also responsible for the conduct complained of herein.

75.     Neither Happy Valley nor Zhao are or have ever been an Amway IBO.

76.     On December 6, 2022, Plaintiffs sent a second cease-and-desist letter to Zhao and Happy Valley ZBB Inc that reiterated the demands in Plaintiffs' May 17, 2022 letter to Wang.

77.     As of the time of filing, Plaintiffs have not received a response to their December 6, 2022 letter or any further response to their May 17, 2022 letter.  Meanwhile, the "everything essentials health" Amazon storefront has continued to list products bearing the Amway Trademarks for sale without abatement.

78.     Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Amway Trademarks through their Amazon Storefront.  Monitoring software estimates that Defendants have sold more than 6,800 infringing products through their Amazon Storefront for revenue in excess of $260,000.

79.     Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from Michigan residents for products

bearing the Amway Trademarks and cause substantial quantities of infringing products bearing the Amway Trademarks to be shipped to persons located in Michigan through the regular course of business.  Defendants have taken no steps to prevent persons located in Michigan from purchasing products from their Amazon Storefront

80.     As of the time of filing, Defendants' Amazon Storefront is called "everything essentials health."  Amazon allows storefront operators to change the name of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.   The "Merchant ID number" for Defendants' Amazon Storefront is A1VU7L4IZF86K8.  Even if Defendants change the name of their Amazon Storefront at some time in the future, the storefront can always be accessed at the following link that includes the storefront's Merchant ID number: https://www.amazon.com/sp?seller=A1VU7L4IZF86K8.

81.     Defendants' disregard of Plaintiffs' cease-and-desist letter and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrate that Defendants are acting intentionally, willfully, and maliciously.

**Defendants Are Infringing the Amway Trademarks by Selling Products Bearing The Amway Trademarks That Are Not Subject To, Do Not Abide By, and Interfere with Plaintiffs' Quality Control and Customer Service Requirements**

82.     Defendants, without authorization from Plaintiffs, have sold—and are continuing to sell—products bearing the Amway Trademarks through their Amazon Storefront.  Defendants may also be selling products through additional storefronts on Amazon or other channels that Plaintiffs have not yet discovered, and cannot discover until they are able to take discovery.

83.     Plaintiffs have implemented quality control and customer service requirements throughout their authorized channels of distribution.  The products sold by Defendants are not

genuine Amway products because they are not subject to, and interfere with, Plaintiffs' quality control and customer service requirements that IBOs must follow.

84.     Plaintiffs' quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to these requirements, Plaintiffs have lost control of the quality of goods that bear their trademarks.  For example, Plaintiffs have no control over whether Defendants carry out the storage and handling requirements that IBOs are required to follow or whether Defendants sell products that are damaged, defective, repackaged, or otherwise altered.

85.     Defendants are also interfering with Plaintiffs' quality control and customer service requirements, among other ways, because Plaintiffs cannot track or conduct a recall of products that Defendants sell to consumers.  Defendants also do not advise—and are not capable of advising—customers about product information and best practices for safe and optimal use of Amway products because, as non-IBOs, they do not have access to the approved literature and other educational materials that IBOs are given to perform these services.

86.     Customers have written reviews of Defendants' Amazon Storefront in which they complained of receiving products that were tampered with, previously used, damaged, and counterfeit:

★☆☆☆☆    "It was delivered broken and almost empty with a torn wet box on it. Now I'm being told I can't return it. I just want it replaced with a full bottle. Really annoying!!! "
Read less
By jaxon on July 5, 2022.

★☆☆☆☆    "I was promised a replacement for the product that arrived damaged and empty. Seller was to send a replacement but has not to date. "
By Catherine Mashburn on July 1, 2022.

★☆☆☆☆    "Not original "
By Nelson Collins on June 29, 2022.

> ★★☆☆☆  "Outside packaging was fine. The box that holds the books and a few books inside were damaged."
> By Ryan H. on January 31, 2022.

87.     These reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefront.  A significant reason why Plaintiffs allow Amway products to be sold only by IBOs who are subject to Amway's quality controls and prohibit IBOs from selling products on online marketplaces is to prevent customers from suffering experiences like those described in the negative reviews of Defendants' Amazon Storefront.

88.     These reviews, along with the numerous negative customer reviews of Amway products that Defendants have sold, *see supra*  ¶¶ 40-47, show that Defendants are very likely not carrying out the quality control inspection, storage, or handling requirements that Amway requires IBOs to follow for Amway products.  Instead, Defendants are likely selling products bearing the Amway Trademarks to consumers that are tampered with, previously used, expired, and damaged. These sales cause customers to write highly negative reviews of Amway products that harm Plaintiffs' reputation.

89.     For all of these reasons, the products being sold by Defendants are also not genuine Amway products because they do not abide by Plaintiffs' quality control and customer service requirements that IBOs must follow.

90.     Through their unauthorized use of the Amway Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Amway products.  In reality, however, the products sold by Defendants are materially different from genuine Amway products because they are not subject to, do not abide by, and interfere with Plaintiffs' quality control and customer service requirements.

**Defendants Are Infringing the Amway Trademarks by Selling
Products Bearing The Amway Trademarks That
Do Not Come With the Amway Satisfaction Guarantee**

91.     As set forth above, Amway products purchased from Plaintiffs or IBOs come with the Amway Satisfaction Guarantee.  Amway, however, does not provide the Satisfaction Guarantee for products purchased from any third party who is not an IBO because Amway cannot ensure the quality of products sold by sellers that are not subject to Plaintiffs' quality controls.

92.     Because Defendants are not IBOs and, thus, are not subject to Plaintiffs' quality control requirements, the products they sell bearing the Amway Trademarks do not come with the Satisfaction Guarantee.

93.     Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Amway products.

94.     The Satisfaction Guarantee is a material element of genuine Amway products. Consumers considering whether to purchase Amway products would find it relevant to their purchasing decision to know whether the product they are purchasing is eligible for the Satisfaction Guarantee.  Consumers who purchase Amway products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Amway stands behind the product, and that they will have 180 days to get a refund, credit, or product replacement if they are dissatisfied with their product for any reason.

95.     Defendants' unauthorized sale of products bearing the Amway Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Amway products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With Amway's Contracts
and Business Relationships With IBOs**

96.     As noted above, Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through IBOs.

97.     Amway has entered into contracts with all of its IBOs that prohibit IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.

98.     Defendants have sold and are continuing to sell a high volume of products bearing the Amway Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more IBOs.  Thus, upon information and belief, Defendants have purchased products from IBOs for the purpose of reselling them on the Internet.

99.     Amway's contracts with its IBOs are a specific class of contract that Defendants are causing IBOs to breach when they purchase Amway products from IBOs.  Although Plaintiffs do not yet know which specific IBO(s) have breached their contracts with Amway—and indeed cannot learn this information with certainty until they are able to take discovery from Defendants in this action—Defendants know how they obtained the products they have sold and are on notice of the basis for Plaintiffs' claim of tortious interference.

100.     By purchasing Amway products from IBOs and then reselling them on the Internet, Defendants caused and induced IBOs to breach their contracts with Amway.

101.     Defendants have known that Amway's contracts with IBOs prohibit IBOs from selling Amway products to third parties, such as Defendants, who the IBOs know or have reason to know are going to resell the products on the Internet.

102.    Defendants have known of this prohibition, among other reasons, because Wang used to be an IBO and knew through this business relationship that IBOs are prohibited from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.  Plaintiffs also regularly broadcast that they do not allow Amway products to be sold on marketplace and auction websites such as Amazon, and experienced sellers of Amway products—such as Defendants—are well aware that IBOs are prohibited from selling Amway products on these websites and from selling to resellers who sell on these websites.

103.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its IBOs by inducing IBOs to breach their contracts and sell Amway products to Defendants that Defendants resold on Amazon.

104.    In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Amway products from IBOs—and in so doing, instigated a breach of the IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Trademarks by reselling the products on the Internet, thereby committing an independent tort.

105.    Defendants are not parties to the contracts they caused IBOs to breach.

106.    If Plaintiffs learn through discovery that Defendants somehow did not obtain from any IBO any of the Amway products they have sold on the Internet, Plaintiffs will dismiss their claim for tortious interference.

**Plaintiffs Have Suffered Substantial Harm As A Result of Defendants' Conduct**

107.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage

29

to the value of their intellectual property, harm to the goodwill associated with the Amway family of brands, and damage to their existing and potential business relations.

108.    Defendants' conduct was and is knowing, intentional, willful, intentional, malicious, wanton, and contrary to law.

109.    Plaintiffs are entitled to injunctive relief because Defendants will otherwise continue to sell unlawfully products bearing the Amway Trademarks that are materially different from genuine Amway products sold by IBOs and are outside of Plaintiffs' quality controls, thereby compromising Plaintiffs' quality controls.  Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Plaintiffs' reputation, goodwill, business relationships, intellectual property, and brand integrity.

## COUNT I
## Trademark Infringement
## 15 U.S.C. §§ 1114 and 1125(a)

110.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

111.    Plaintiffs are the owner and licensee of the Amway Trademarks.

112.    Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

113.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

114.    Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

115.   The products that Defendants sell bearing the Amway Trademarks are not authorized for sale by Plaintiffs.

116.   Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

117.   Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

118.   The products sold by Defendants are not, in fact, genuine and authentic Amway products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

119.   Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

120.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

121.   Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

122.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

123.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Amway Trademarks.

## COUNT II
### Unfair Competition
### 15 U.S.C. § 1125(a)(1)(A)

124.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.    Plaintiffs are the owner and licensee of the Amway Trademarks.

126.    Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

127.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

128.    Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling Amway products on the Internet without Plaintiffs' consent.

129.    The products that Defendants sell bearing the Amway Trademarks are not authorized for sale by Plaintiffs.

130.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products

legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs when they are not.

131.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products when they are not.

132.    Defendants' unauthorized sale of products bearing the Amway Trademarks and unauthorized use of the Amway Trademarks in advertising infringes on the Amway Trademarks.

133.    Defendants' unauthorized sale of products bearing the Amway Trademarks and unauthorized use of the Amway Trademarks in advertising has materially damaged the value of the Amway Trademarks and has caused significant damages to Plaintiffs' business relations.

134.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

135.    Plaintiffs are entitled to recover their damages caused by Defendants' unfair competition and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

136.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

137.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

**COUNT III**
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

138.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139.    Products bearing the AMWAY® trademark have been sold to the public since 1959.  For over 60 years, Plaintiffs and their predecessor companies have been recognized by consumers as the source of high quality products bearing the AMWAY® trademark, beginning with cleaning products and expanding to nutrition, beauty, bath and body, cookware, household, and many other types of products.

140.    The AMWAY® trademark was first filed with the United States Patent and Trademark Office in 1960, and was registered in 1961.  Since that time, the AMWAY® trademark has been filed and registered with respect to numerous categories of goods and services.

141.    Alticor owns the Amway Trademarks and has licensed the Amway Trademarks to various subsidiaries, including Amway.

142.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

143.    Plaintiffs have expended substantial time, effort, money, and resources advertising and promoting products and services under the AMWAY® trademark.  As a result of Plaintiffs' efforts, the AMWAY® trademark is the means by which Amway products and services are distinguished from others in the marketplace.

144.    Plaintiffs market, advertise, and sell products bearing the AMWAY® trademark throughout the United States.

145.     Amway has implemented legitimate and substantial quality controls that it requires all IBOs to follow to protect the Amway name and family of brands.

146.     Consumers throughout the United States recognize and associate the Amway name with quality.

147.     Because of the quality, durability, and dependability of Amway products and Plaintiffs' use of the AMWAY® trademark, consumers trust the Amway name and Amway products.

148.     The AMWAY® trademark is inherently distinctive, and as a result of Plaintiffs' long and continuous use of the AMWAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Plaintiffs' products and services.

149.     Amway is widely recognized as the designated source of goods bearing the AMWAY® trademark.

150.     For these reasons, since at least 1970, the AMWAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

151.     After the AMWAY® trademark became famous, beginning in or around 2018, Defendants have willfully used the AMWAY® trademark in connection with the unauthorized and illegal sale of products.

152.     Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Plaintiffs' quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, or defective product and have an unsatisfactory customer experience.

153.     Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by IBOs are likely to associate that negative

experience with Plaintiffs and the AMWAY® trademark.  As a result, Defendants' unauthorized and willful use of the AMWAY® trademark is tarnishing and diluting the value and distinctive quality of the AMWAY® trademark.

154.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the AMWAY® trademark, and Plaintiffs have suffered and will continue to suffer immediate and irreparable injury.  Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Amway products.

155.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

156.    Plaintiffs are entitled to recover their damages caused by Defendants' dilution of the AMWAY® Trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

157.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

158.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith diluted the Amway Trademarks.

## <u>COUNT IV</u>
### Common Law Trademark Infringement and Unfair Competition

159.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

160.    This claim arises under the laws of the State of Michigan.

161.    Plaintiffs are the owner and licensee of the Amway Trademarks.

162.    Alticor has registered the Amway Trademarks with the United States Patent and Trademark Office.

163.    The Amway Trademarks are valid and subsisting trademarks in full force and effect.

164.    Defendants have willfully and knowingly used, and continue to use, the Amway Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

165.    The products that Defendants sell bearing the Amway Trademarks are not authorized for sale by Plaintiffs.

166.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

167.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

168.    The products sold by Defendants are not, in fact, genuine and authentic Amway products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

169.    Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

170.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

171.    Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

172.    In harming Plaintiffs, Defendants have acted with willful misconduct and actual malice.  Accordingly, Plaintiffs are entitled to an award of exemplary damages.

## COUNT V
**Unfair Competition In Violation of Michigan Consumer Protection Act**
**Mich. Comp. Laws §§ 445.901, et seq.**

173.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

174.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

175.    Defendants' use of the Amway Trademarks in connection with their unauthorized sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

38

176.     The products sold by Defendants are not, in fact, genuine and authentic Amway products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

177.     Defendants' unauthorized use of the Amway Trademarks has materially damaged the value of the Amway Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Trademarks.

178.     Defendants' actions constitute an unfair or deceptive sales practice as described in Michigan Consumer Protection Act, §§ 445.901, et seq.

179.     In harming Plaintiffs, Defendants have acted with willful misconduct and actual malice.  Accordingly, Plaintiffs are entitled to an award of exemplary damages.

<u>**COUNT VI**</u>
**Tortious Interference with Existing Contracts and Business Relationships**

180.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

181.     This claim arises under the laws of the State of Michigan.

182.     Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through IBOs.

183.     Amway has entered into contracts with IBOs that prohibit IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.

184.     Defendants have sold and are continuing to sell a high volume of products bearing the Amway Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more IBOs.

185.    By purchasing products from IBOs and then reselling them on the Internet, Defendants caused and induced IBOs to breach their contracts with Amway.

186.    Defendants have known that Amway's contracts with IBOs prohibit IBOs from selling Amway products to third parties, such as Defendants, who the IBOs know or have reason to know are going to resell the products on the Internet.

187.    Defendants have known of this prohibition, among other reasons, because Wang used to be an IBO and knew through this business relationship that IBOs are prohibited from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.  Plaintiffs also regularly broadcast that they do not allow Amway products to be sold on marketplace and auction websites such as Amazon, and experienced sellers of Amway products—such as Defendants—are well aware that IBOs are prohibited from selling Amway products on these websites and from selling to resellers who sell on these websites.

188.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its IBOs by inducing IBOs to breach their contracts and sell products to Defendants that Defendants resold on Amazon.

189.    In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Amway products from IBOs—and in so doing, instigated a breach of the IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Trademarks by reselling the products on the Internet, thereby committing an independent tort.

190.    Defendants were not parties to the contracts that they caused IBOs to breach.

191.    Defendants' actions have caused injury to Plaintiffs for which Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

192.    Plaintiffs are entitled to recover exemplary damages because Defendants have acted with malice and willful and wanton misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Judgment in favor of Plaintiffs and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    A permanent injunction enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

> i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Amway products;
>
> ii)    Prohibiting the Enjoined Parties from using any of the Amway Trademarks in any manner, including advertising on the Internet;
>
> iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Amway products as well as any products bearing any of the Amway Trademarks;
>
> iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Amway Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;
>
> v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Amway products or any of the Amway Trademarks;

41

vi)   Requiring the Enjoined Parties to take all action, including but not limited to, requesting Internet search engines (such as Google, Yahoo!, and Bing) to remove from the Internet any of the Amway Trademarks which associate Amway products or the Amway Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)  Requiring the Enjoined Parties to take all action to remove the Amway Trademarks from the Internet, including from the websites www.amazon.com and www.amazon.com; and

viii) Requiring Defendants to destroy or return to Plaintiffs all products bearing the Amway Trademarks in their possession, custody, or control.

C.   An award of attorneys' fees, costs, and expenses; and

D.   Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated:  January 19, 2023                    */s/Edward J. Bardelli*
                                            Edward J. Bardelli (P53849)
                                            WARNER NORCROSS + JUDD LLP
                                            1500 Warner Bldg.
                                            150 Ottawa Ave, NW
                                            Grand Rapids, Michigan 49503
                                            (616) 752-2165
                                            ebardelli@wnj.com

                                            Kent A. Britt (Ohio Bar No. 0068182)
                                            Daniel C.F. Wucherer (Ohio Bar No. 0097210)
                                            VORYS, SATER, SEYMOUR AND PEASE LLP
                                            301 E. 4th Street, Suite 3500
                                            Cincinnati, Ohio 45202
                                            (513) 723-4488
                                            (513) 723-4093
                                            kabritt@vorys.com
                                            dcwucherer@vorys.com

                                            *Attorneys for Plaintiffs Alticor Inc. and*
                                            *Amway Corp.*